THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ORIENTAL FINANCIAL GROUP, INC., et al.,

    **Plaintiffs,**

    **v.**

                                    **Civil No. 10-1444 (ADC)**

**COOPERATIVA DE AHORRO Y CRÉDITO
ORIENTAL,**

    **Defendant.**

---

## OPINION AND ORDER

    In this long-running dispute under the Lanham Act, 15 U.S.C. § 1051 et seq., and Puerto Rico law, a Puerto Rico bank (plaintiffs) and a Puerto Rico credit union (defendant) are locked in a dispute over how the credit union can market itself, as well as its goods and services, without trampling upon the bank's trademark rights as the senior user of the arbitrary mark ORIENTAL. The Court issued an injunction against the credit union in 2010, enjoining it "from using its new [2009] logo—in particular, the prominent placement of the word 'Oriental'—and its new color scheme."[1] **ECF No. 54** at 15; *see* also **ECF Nos. 1** at ¶ 27 (copy of enjoined logo); **1-2** at 6 (same). The First Circuit Court of Appeals has since determined that defendant Cooperativa de Ahorro y Crédito Oriental's use of its COOP ORIENTAL, COOPERATIVA

---

[1] The credit union did not appeal that Order. *Oriental Fin. Grp., Inc.* v. *Cooperativa de Ahorro y Crédito Oriental*, 698 F.3d 9, 20 (1st Cir. 2012) ("Cooperativa does not challenge the judgment entered by the district court, enjoining it from use of the 2009 logo and trade dress, but rather urges that the judgment be affirmed."). Nothing in this Order questions or narrows the scope of that earlier Order, which remains intact.

ORIENTAL, and ORIENTAL POP marks also infringes the rights of plaintiffs Oriental Financial Group, Inc., Oriental Bank & Trust, and Oriental Financial Services Corp. in the ORIENTAL mark. *Oriental Fin. Grp., Inc.* v. *Cooperativa de Ahorro y Crédito Oriental*, 832 F.3d 15, 36 (1st Cir. 2016). Reminding this Court that "[i]njunctive relief does not flow automatically from a finding of trademark infringement," and that "[t]he decision to grant or deny expanded injunctive relief rests in the discretion of the district court, to be exercised consistent with 'well-established principles of equity' . . . in light of present circumstances," the Court of Appeals remanded the action for an injunction proceeding. *Id*. at 37 (quoting *eBay Inc. v. MecExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

In due course, plaintiffs moved this Court for expanded injunctive relief based upon the Court of Appeals's findings of infringement. **ECF No. 157**. Defendant opposed the motion, **ECF No. 160**. With leave of Court, plaintiffs replied to defendant's opposition. **ECF No. 166**. The Court then held an evidentiary hearing on plaintiffs' motion, which ended up spanning six days over the course of six weeks. **ECF Nos. 168**, **170**, **172**, **177**, **178**, **192**; *see* also **ECF Nos. 186**, **187**, **188**, **189**, **190**, **191**. At the hearing, plaintiffs appeared to be challenging, for the first time, defendant's ability to use its full corporate name—Cooperativa de Ahorro y Crédito Oriental—as a mark, even though they had routinely conceded, before this Court and the Court of Appeals, that they were not questioning defendant's use of that name, including logos that this Court had

approved upon the parties' stipulation, back in 2010.[2]  *See* **ECF No. 174** (overview of plaintiffs'

concessions).  Thus, the Court ordered plaintiffs to show cause why they are not precluded from

contesting defendant's use of its full name after conceding for years, including twice before the

Court of Appeals, that defendant's use of its full corporate name is lawful.  *Id*. at 8.  After

plaintiffs had fully presented their case in chief, they responded to the show-cause Order, **ECF**

**No 181**, and filed a Rule 60(b)(5) motion for modified injunctive relief, **ECF No. 182**.  After

defendant had fully presented its own case, it responded in opposition to plaintiffs' show-cause

response, **ECF No. 197**, and also to their Rule 60(b)(5) motion, **ECF No. 213**.  Plaintiffs then

replied to defendant's responses.  **ECF Nos. 202**, **220**.[3]  The Court now finds that plaintiffs

warrant an expansion of injunctive relief, but not to the fulsome extent they seek.

---

[2] Even in their motion for expanded injunctive relief, plaintiffs did not challenge defendant's right to use its full corporate name to market itself and its goods and services.  *See*, e.g., **ECF No. 157** at 18 (declaring that "the injunctive relief sought by [plaintiffs] . . . will merely require [defendant] to use a name—*i.e.* its full corporate name—that does not cause confusion with [plaintiffs'] marks."); *id*. at 20 ("the permanent injunction should specify that [defendant] can only advertise and do business under its full corporate name, *Cooperativa de Ahorro y Crédito Oriental*, and that in using the Court approved logo it avoid using color combinations that render the words '*de Ahorro y Crédito*' indiscernible.").  When plaintiffs finished presenting to the Court their evidentiary case in chief on November 16, 2016, they again declared, "We are requesting that the Cooperativa going forward be required to use its full name . . . ." **ECF No. 188** at 49–50.  It was only on December 16, 2016, three days before the final day of the hearing (after defendant had already presented the bulk of its own case) that plaintiffs moved the Court "to bar [defendant] from using the Court-sanctioned logos with its full name, any other logo with its full name, and from using the ORIENTAL mark altogether; and that [defendant] be ordered to adopt a new name . . . that does not contain the word ORIENTAL." **ECF No. 182** at 21.

[3] Plaintiffs' reply at **ECF No. 203** answers a filing—namely, defendant's response at **ECF No. 198**—that the Court struck from the record by the Order at **ECF No. 206**.  Accordingly, the Court will not consider that reply.  Ultimately, defendant filed a new response at **ECF No. 213**, and plaintiffs replied to it at **ECF No. 220**.  Neither party has requested an opportunity to brief the Court further on the issues or facts.

I.      **Summary of Relevant Evidence from the Evidentiary Hearing**

The evidentiary hearing during which a total of twenty-one witnesses testified was lengthy, and the parties had extensive opportunity to examine such witnesses, both, in direct and cross-examination.[4]

Plaintiffs' witnesses—nearly all of them employees of their bank, Oriental Bank—testified about the bank's marketing strategies, its use of trade and service marks, defendant's use of various competing marks, and sporadic instances of people appearing to confuse plaintiffs' bank with defendant's credit union. The essence of these testimonies is summarized below.

Idalis Montalvo-Delgado ("Montalvo"), Oriental Bank's Vice President of Marketing and Public Relations, testified that the bank is presently the second or third largest bank in Puerto Rico (depending on whether one measures it by number of branch locations or dollar amount of assets and deposits), servicing about 278,000 clients. **ECF No. 186** at 12. The bank's current logo, which it has used since 2013, is simply the word ORIENTAL, printed in a distinct shade of orange. *Id.* at 15; *see* also Pls.' Ex. 2. The bank has created a Brand Book, which standardizes the font, size, and color to use when printing its logo. **ECF No. 186** at 22–23. She further testified that plaintiffs have a "family of marks which are derived from the main mark which describe products or affiliates of the brand," including: Oriental Personal Banking, Oriental Insurance,

---

[4] The parties, in their final briefing on whether an expanded injunction is warranted, make surprisingly little use of the evidence they proffered at the six-day evidentiary hearing. *See* **ECF Nos. 182**, **213**, **220**.

Oriental Leasing, Oriental Bank & Trust, Oriental Insurance, Oriental Mortgage, Oriental Auto, and Oriental Wealth Management. *Id*. at 18, 17-20.

Montalvo also testified that plaintiffs use the marks in "the press, TV, radio, digital media, branches, direct mailing and promotions and [e-mail] blast[s]." *Id*. at 20.  Plaintiffs also use the marks in the internet via their website, other websites such as those of the press, and social media. *Id.*, 25-26. Over the past seven years, the bank has budgeted approximately $6.1 million per year for advertising, but its advertising budget has decreased in recent years and, in 2016, was only $5.1 million.  *Id*. at 39.

Isabelita Ortiz-Durán ("Ortiz-Durán"), an outside media consultant for Oriental Bank, stated that the bank employs an "always on" mass-media advertising strategy, with a particular emphasis on Puerto Rico TV and newspapers.  **ECF No. 187** at 52, 55, 71, 78.  According to Vice President Montalvo, Oriental Bank is "very jealous [about] protecting our brand and the service we provide our consumers."  **ECF No. 186** at 54.  She testified that since 2010, she has noticed a greater advertisement presence by defendant, and "observed that they continue to use the COOP Oriental brand and in some instances in the family, or in the brand of the family they include mortgages under the COOP Oriental." *Id.* at 40.  In Montalvo's view,  the injury created by the confusion of plaintiffs' brand by defendant's continued to use of the marks Cooperativa Oriental, COOP Oriental, and Oriental Pop will be "incalculable."  *Id*. at 54, 55-56.

Plaintiffs' remaining witnesses—over a dozen of them—testified mostly to their experiences with (or hearsay knowledge of) clients appearing to confuse Oriental Bank with

Cooperativa de Ahorro y Crédito Oriental.  The frequency of this confusion appears to be, as characterized by one of the witnesses, "sporadic."  *See* **ECF No. 187** at 135.

Ely Figueroa-Rodríguez ("Figueroa-Rodríguez"), a Branch Manager at Oriental Bank's Las Catalinas Branch in Caguas, Puerto Rico, claimed that since she began her job in 2012, she has encountered only one instance of a customer confusing plaintiffs' bank with defendant's credit union.  *Id.* at 106.  She recalled that in early 2016, a woman showed up to the bank to request a personal loan, due to a letter she had received from the credit union preapproving her for one.  *Id.* at 104.  When informed that the bank and credit union are separate entities, the woman indicated she had thought they were the same.  *Id.* at 105.  Figueroa also testified that she had been told by bank tellers at the same branch that about two to three people each week try to cash a check, drawn on an account with defendant's credit union, at her branch of plaintiffs' bank.  *Id.* at 109; *see* also *id.* at 105–06.[5]  Meanwhile, Elizabeth Ortiz-Vázquez (Ortiz), a teller at Oriental Bank's Las Catalinas branch since January 2014, initially stated that she has dealt with "[a]bout one to three [people] a week" trying to cash one of defendant's checks at her branch.  *Id.* at 112.  But, upon further examination, it turned out she has dealt with only two

---

[5] The Court does not place much weight upon such hearsay because, absent cross-examination of the declarant with personal knowledge of the event, it is difficult, if not impossible, to tell whether the event was actually an instance of confusion, as opposed to mere carelessness or perhaps something else entirely.  Indeed, an example is found in the testimony of Oriental Bank teller Elizabeth Ortiz-Vázquez.  It was her statement on direct that she deals with up to three clients each week confusing plaintiffs' bank with defendant's credit union. At the end, it was clear that her testimony was based upon her experience with only two clients—since 2014.  *See* **ECF No. 187** at 112–15.  Notably, the checks at issue in those two instances appear to have used the same unorthodox logo for the credit union—a logo, moreover, that plaintiffs have failed to show defendant ever authorized.  *See id.* at 114, 117–18; *see also* **ECF No. 188** at 116–17 (indicating that defendant has no control over the personal checks its clients use).

such people, the first of whom she encountered just one month prior and experiencing both

incidents in 2016.  *Id*. at 113–14.  More so, the witness admitted having shared such information

with two other co-workers, Brenda Delgado-Colón and Elsie Figueroa, who alluded to her same

two incidents during their testimonies.

Gilberto Medina-Cardona ("Medina"), the Commercial-Relations Manager at Oriental

Bank's Bairoa Branch in Caguas, where he has worked since 2011, indicated that when

Cooperativa de Ahorro y Crédito Oriental first moved to Caguas, people would read "the sign

for the [construction] permits" at the credit union's new location and perhaps three to five of

them per month would ask him whether his branch of Oriental Bank was moving to that

location.  *Id*. at 118–20, 122.  He, however, did not know why the credit union's construction

signage had caused people to wonder if his bank was moving; he never saw the site signs

himself.  *Id*. at 120.  Neither was there evidence that defendant had designed or placed the

construction permit sign. But once the Cooperativa had opened its new branch, people stopped

asking whether Oriental Bank was going to move.  *Id*. at 123–24.  The only other time Medina

met someone who appeared to confuse his bank with defendant's credit union was in or around

2014, when a client wanted to open an account with the bank, so that his paycheck could be

directly deposited there.  The customer thought that his employer also had an account with the

bank, but it turned out that the employer had an account, instead, with the credit union.  *Id*. at

121–22, 127.  Medina had no idea why the customer thought that his employer had an account

with Oriental Bank.[6]  *Id*. at 125.

Nancy Santiago-Velázquez ("Santiago") has been a teller at Oriental Bank for twenty-

three years, the last seven (7) years being employed at the Humacao Plaza Mall Branch, where

she has had "sporadic" encounters with clients seeming to confuse plaintiffs with defendant.

*See id*. at 135.  Despite her long tenure at the front lines of the bank, Santiago could recall only

two specific check-cashing incidents taking place around October, 2016 and the occasional

mistaken attempt to conduct a loan payment.  Some months earlier, "clients" attempted a

transaction at her branch, assuming they had their accounts at Oriental. When questioned by

Santiago where they had their account, the response was "at Oriental on the other side" (of the

street). When Santiago told them that the bank and the credit union were different entities, they

stated that they had opened an account with defendant under the assumption that the account

was with plaintiffs.  *Id*. at 133–34.  Then, the week before she testified, Santiago observed a

person try to cash two checks drawn on a Cooperativa Oriental account at her Oriental Bank

branch.  *Id*. at 131–32.  She did not see the checks herself, but her colleague, who had handled

the customer, told her that the checks "were two Cooperativa checks."  *Id*. at 133.  Finally,

Santiago testified that "sporadically," about "every three months," a person will try to deposit

a loan payment for defendant's credit union at her branch's drive-in ATM.  *Id*. at 134.  The teller

---

[6] This incident portrays not a confusion of signage or marks but rather a misperception or lack of
information as to where Medina's employer had its bank account.

is able to catch this mistake by seeing that the payment is "a Cooperativa check." *Id*.  During

cross-examination, Santiago clarified she has not seen personal but rather managers checks. In

her experience, checks drawn on an account with the Cooperativa identify the credit union as

COOP ORIENTAL or COOPERATIVA ORIENTAL in "small lettering," but with ORIENTAL

more visible. *Id*. at 136.  Santiago has not personally encountered any other incidents involving

defendant's credit union. *Id*. at 134.

Veronica Álvarez-Ortiz ("Álvarez") worked her way up from teller to Branch Manager

at Las Piedras Branch with Oriental Bank having worked at several of its branches (San Lorenzo,

Ceiba, Humacao) throughout a decade of service. *Id*. at 142–43.  She first learned of defendant's

credit union in 2007 when several clients of defendant with "Cooperativa Oriental checks"

visited Oriental Bank's San Lorenzo branch, where she was working at the time.[7] *Id*. at 143–45.

Later, she heard of defendant while working at Oriental's Branch in Ceiba. The only examples

of the apparent confusion of plaintiffs' bank with defendant's credit union to which Álvarez

testified were: (a) three to five people who, between 2012 and 2015, tried to voluntarily turn in

their vehicles to Oriental Bank's Humacao branch, thinking that the branch was affiliated with

defendant's credit union, where the vehicles were supposed to be turned in; and (b) some

---

[7] The Court surmises that if the incidents had involved any trace of client confusion, plaintiffs' counsel would have highlighted it during their examinations.  In any event, even if the Court assumed that the incidents involved customer confusion, the incidents appear to have been "sporadic," occurring only about once every couple of months.  **ECF No. 187** at 145-150.  By contrast, Nancy Santiago-Velázquez specified that the client in her check-cashing incident was told to cash his checks at the credit union, thereby indicating that he did not have an account at the bank.

incidents regarding attempts to cash checks from Cooperativa between 2007 and 2012 while she worked at the San Lorenzo and Ceiba's Oriental Branch. *Id*. at 145–46, 151. Álvarez also mentioned that, a month or two before her testimony, she had a client who had approached her, concerned about the financial health of Oriental Bank and her investments, in light of Puerto Rico's municipal-bond crisis. *Id*. at 146. Álvarez noted, without elaboration, that the client "believed that we had a relationship with the Cooperativa." *Id*. Reportedly, upon being asked about Oriental's financial health, Alvarez explained to the customer that Oriental was federally insured. [8]

In sum, Alvarez testified that during the three months she worked at the Ceiba Branch, and the approximately 200-300 clients that visited the Branch on a weekly basis, only once did someone go to her with a check, that "appeared to be a Manager's Check" drawn from a Cooperativa account. Similarly, between 2012 through 2015, she reported an estimate of two to

---

[8] The content of this client's alleged belief is unclear and, again, plaintiffs have failed to clarify this gap in the record. From the testimony it is not clear to what "relationship" was the client referring to and much less, in which financial entity she had her deposits or investments done. The Court declines to find that the witness's use of the word "relationship" means that the client believed that plaintiffs' bank and defendant's credit union share a common owner or are otherwise corporate affiliates. After all, the client may have thought that Oriental Bank had extended a confirmation of commercial letters of credit issued by Cooperativa de Ahorro y Crédito Oriental, such that Oriental Bank would be liable to honor the letters of credit were the Cooperativa to default on them. Needless to say, there would be nothing odd about describing such a contract between plaintiffs and defendant as a relationship. *See Dibrell Bros. Int'l S.A.* v. *Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1580 (11th Cir. 1994) (per curiam). The point, here, is simple: if plaintiffs had wanted the Court to find that the client had thought that the bank and the credit union are the same institution, plaintiffs needed to do more than have their witness state, without elaboration, that the client believed that the bank had an unspecified "relationship" with the credit union. *See* **ECF No. 187** at 146.

three clients of Cooperativa that attempted to return their vehicles at Oriental. She could not

remember other details regarding such events.

Norma Galarza-Rivera ("Galarza"), a Branch Manager at Oriental Bank's La Rambla

Branch in Ponce, where she has worked since 2012, testified she had never attended to customers

confusing the Cooperativa with the Bank. Nonetheless, she mentioned knowing of only two

instances where a client appeared to confuse the bank with defendant's credit union. *Id*. at 154.

Galarza recounted that once, a teller at her branch received a loan payment for the credit union.

*Id*. at 155. The second incident related to a customer who came to the branch to check on the

status of her bank account, but it turned out her account was with the credit union. *Id*. at 155–

56. Galarza never identified when these incidents occurred; more so, if it occurred after the 2010

injunctive relief. Galarza then mentioned that she had received two telephone calls, over the

years, asking whether she (Oriental) sold tickets to the Baloncesto Superior National games. *Id*.

at 154, 158. Although the callers never stated that they were trying to reach Cooperativa de

Ahorro y Crédito Oriental, Galarza assumed that they were trying to reach the credit union

because, she later learned, the credit union co-sponsors the games.[9] *Id*. at 155. In sum, Galarza

---

[9] Norma Galarza-Rivera's testimony provides an interesting lesson. At first, when asked whether she had ever heard of defendant's credit union as part of her employment with plaintiff's bank, she immediately turned to "people calling [her] to ask for tickets for the [Baloncesto Superior Nacional] game." **ECF No. 187** at 154. When asked why she associated those calls with the credit union, she stated that she "went to the . . . games and . . . could see [the credit union] w[as] one of the sponsors." *Id*. at 155. But, when specifically asked on cross-examination, her knowledge about the credit union's sponsorship was based only on inferences made from her observation, during the games, of an advertisement. Specifically, she saw an ad that stated ORIENTAL in the color orange. *Id*. at 158, 161. The record strongly suggests that the ad that Galarza saw was not one of the credit union's, but one of Oriental Bank's. *See* Def.'s Ex. Y (showing an Oriental Bank ad, played during one of the games, fitting that description). Moreover, as noted in the main text, Galarza has received

has never personally encountered a person entering Oriental Bank, thinking they were entering

a branch of Cooperativa de Ahorro y Crédito Oriental instead.  *Id*. at 160.

Zeidy Escandón-Velázquez ("Escandón") has worked as a teller for Oriental Bank in

Ponce for over five years during which the last four she has worked at "Ponce Hostos" Branch.

Escandón stated that in average, from 600 to 1000 transactions took place at her Branch, per

week. *Id*. at 162.  Over the course of those years, she has had only one client come to the bank to

cash a manager's check drawn on an account with defendant's credit union and, to her

knowledge, a similar incident has occurred only one other time (to one of her colleagues).[10]  *Id*.

at 163, 166.  The only other instances of potential customer confusion she has heard of are

hearsay.  For example, a coworker once told her that a customer had come to the bank with

inquiries regarding a document showing that defendant's credit union had preapproved him

for a loan.[11]  *Id*. at 163–64.  Escandón also mentioned that another coworker once told her "that

---

only two such calls, and neither caller indicated that he was trying to reach the credit union.  **ECF No. 187** at 155, 158.  Accordingly, Galarza's primary example of consumer confusion hardly shows any confusions but her own.

[10] The Court infers that at least one of these two incidents involved an apparent confusion of plaintiffs' bank with defendant's credit union.  When asked about "the reaction of the clients when they were told there was no relationship between Oriental and Cooperativa," the witness replied, "In the case involving the check cashing, the client left annoyed because he had stood in line and when he reached the teller, when he told them it wasn't here, he got mad because he had stood in line and he thought it was the same thing."  **ECF No. 187** at 166.

[11] It is far from clear that this incident has anything to do with the confusion of one financial institution with another.  The witness related the anecdote after having been asked to explain the circumstances under which she had "heard" of defendant's credit union.  **ECF No. 187** at 163.  And, it is common knowledge that, when shopping around for the best rate on a loan, a prospective client may show one institution the interest rate he might receive at another institution.  *See* **ECF No. 188** at 91–92, 98.  The Court will not blindly assume that an incident involved customer confusion simply because plaintiffs have elicited vague testimony about it.

she had received loan payments," presumably for the credit union, "through the drive-in window." *Id*. at 164.  Escandón also related the story of a client who was having "problems" dealing with "the estate of his deceased wife," and while at Oriental Bank complained that his delay in providing some documents to the bank was prompted by his "attorney" who had allegedly confused Oriental Bank with Cooperativa de Ahorro y Crédito Oriental, thinking they were the same institution.[12]  *Id*. at 164–65.  Finally, Escandón mentioned that twice she had encountered people come to the bank to buy vouchers and stamps, which the bank does not sell. *Id*. at 164.  When informing these people that the bank does not sell vouchers and stamps, "they say that they were told that it was at Oriental."  *Id*.  Escandón assumed that these clients must have been told to go to Cooperativa Oriental, but she later admitted that other banks sell vouchers and stamps and that the clients may have been erroneously told that Oriental Bank similarly sells them, too.  *Id*. at 167.

Yalessa Arce-Rivera ("Arce") has worked as an Oriental Bank teller for four years, of which she has served for fifteen months at its Las Américas Branch in Ponce.  *Id*. at 169.  Over the course of those years, she has met only one customer who has confused the bank with

---

[12] As stated in footnote number five above, the Court does not place much (if, indeed, any) weight upon such hearsay, especially where, as here, one person is seeking to blame another for a delay or confusion. It is clearly an open question whether the client's excuse was genuine, accurate, or based at all in fact. Interestingly, when defense counsel objected to this testimony of hearsay grounds, plaintiffs responded that it was not hearsay because they were not submitting if for the truth of the matter (i.e., whether the attorney had actually confused one institution for another), but only that the client had given that excuse to the bank. **ECF No. 187** at 165.  Of course, whether the client used confusion as an excuse has little to no bearing on whether such confusion ever occurred.

defendant's credit union.  She explained that two months earlier (September, 2016), an elderly lady came to the bank to cash a check drawn on an account with the credit union. Since the lady didn't have an account at Oriental Bank the transaction could not be carried out.  *Id.* at 170.  The woman was "upset" to learn that she had to go and cash the check instead at the credit union after spending significant time standing in line.  *Id.* at 171.  There was no testimony as to whether the elderly lady had confused both financial institutions or simply considered she could have cashed her check at Oriental Bank.

The only other incident Arce could summon did not have an explicit connection to the credit union.  About two and one-half years earlier, while standing on an outdoor balcony, a man shouted at her from a car, to ask whether she had any tickets to the basketball game (presumably being sold by Cooperativa).  *Id.* at 170.  Arce assumed that the man must have been asking to buy tickets from her as an Oriental Bank employee (as opposed to asking her personally), reason for which, she further assumed, he was confusing Oriental Bank with the credit union.  *Id.* at 172.  Arce later admitted during cross-examination that she was simply assuming that the person in the car—or, for that matter, anyone else who came to the bank to buy a ticket to the game—had confused the bank with the credit union. However, at the time, the individual made no specific reference to the credit union.  *Id.* at 170, 172.  Arce also acknowledged that other banks had sponsored the basketball league but denied any knowledge as to whether Oriental Bank sponsored the National Basketball games from 2012 to 2014.  *Id.* at 173, 176–77.

Yesenia Bonilla-Ortíz ("Bonilla") has worked for Oriental Bank since July 2007, and she is currently a Branch Manager at its Plaza Centro location in Caguas.[13]  **ECF No. 188** at 4. However, Bonilla had previously worked at the bank's locations in Bayamón, Carolina, Cidra, Condado, Guayama, and Ponce, amongst others.  *Id.*  Despite her nearly a decade of service at Oriental Bank branches across Puerto Rico, the first time that Bonilla ever heard of Cooperativa de Ahorro y Crédito Oriental, pursuant to her employment with the bank, was only a month and a half earlier.  *Id.* at 5, 7.  In fact, Bonilla could think of only three instances in which a client appeared to confuse the bank with defendant's credit union.  *Id.* at 8.  In two of the instances, a customer tried to cash a personal check at Oriental Bank that had been drawn on an account at defendant's credit union.  *Id.* at 5.  One of the checks identified the credit union as ORIENTAL, with the name written in large font, and the rest of its name in "small lettering" underneath.  *Id.* at 8, 10.  The other check appeared to highlight COOP instead.  *Id.* at 10.  The individual with the ORIENTAL check questioned Bonilla as to why the bank was not cashing the check even though the check read "Oriental."  *Id.* at 5.  It later became clear that the client thought that the bank and defendant's credit union were the same.  *Id.*  The third incident had taken place two weeks before her testimony. Then a client, to whom the bank had just issued a loan, asked Bonilla if she could later make her loan payments at defendant's credit union.  *Id.* at 7.  All of these incidents took place at Oriental Bank's Plaza Centro Branch.

---

[13]  Reportedly, at the Plaza Centro Branch, approximately from 3000 to 4000 transactions are performed on a weekly basis, mainly consisting of payments and deposits. Additionally, from thirty to fifty new accounts are opened weekly and from twenty to twenty-five loan customers are received weekly. *Id.* at 5-11.

Melissa Zayas-Moreno ("Zayas") has worked as a teller in Oriental Bank's Canóvanas branch since 2012. *Id*. at 13–14. Her branch processes approximately 9,000 transactions per month, and as per her testimony every three months perhaps three to four customers try to cash a check there, even though the check has been drawn on an account at defendant's credit union. *Id*. at 15, 17. There are months in which there are none "and then you get two or three." *Id*. at 16. The checks are "large checks, like from commercial accounts[,] . . . that were printed out by a company." *Id*. The checks are always gray in color, identifying the credit union as COOP ORIENTAL in orange text. *Id*. at 19. When these people are told that they have to go to the credit union to cash their checks because the bank is not affiliated with the credit union, "[t]hey get upset because they think [the bank doesn't] want to provide them [with] service." *Id*. at 16.

Plaintiffs' final two witnesses are the only ones to testify to instances of apparent client confusion that are more than sporadic or rare. Brenda Delgado-Colón ("Delgado") has been the Commercial-Relations Manager for Oriental Bank's Las Catalinas branch in Caguas for one year and, prior to that, she served as that location's Branch Manager for seven years. **ECF No. 187** at 91–92, 95. According to her, ever since the Las Catalinas branch opened in December 2008, three to four people each week ask her whether Cooperativa de Ahorro y Crédito Oriental is a subsidiary or part of Oriental Bank. *Id*. at 94. Delgado testified that she performs eighty percent of her work looking for and after clients. The other twenty percent is administrative work at the Branch. Based on her guess that she was meeting with twenty clients each week, *id*. at 99, Delgado is claiming that fifteen to twenty percent of Oriental Bank's weekly clientele at Las

Catalinas, is confused enough about the credit union's relationship with the bank so as to ask her whether the two institutions are affiliated.[14]  She also mentioned having heard of similar confusions at the Branch, involving questions regarding check cashing and loan offers, *id*. at 95. Nonetheless, Delgado stated that she has never personally encountered anyone at the Branch location itself, who had confused the bank with the credit union.  *Id*. at 96.  When pressed to give an example of one of the many confused customers she has allegedly encountered outside of her Branch, Delgado mentioned that at times, while being "introduced to someone at lunch" she had been asked whether she "work[ed] for Cooperativa" or if she "worked close by."  *Id*. at 101.  Because the Las Catalinas Oriental Branch was not close by, but rather a Cooperativa Oriental Branch presumably was (the record, however, does not say), Delgado thought that her new acquaintance must have assumed she worked for the credit union, instead of the bank.  *Id*. at 101–02.  Delgado gave no reason why her assumption was reasonable.  After all, rather than

---

[14] Even if the Court considered, instead, Brenda Delgado Colón's statement that two to three, rather than three to four, of her twenty weekly clients voice confusion, that would still mean that, according to her, ten to fifteen percent of her branch's clients are confused.  The Court finds that testimony incredible. Actually, this testimony contrasts with that of Gilberto Medina, Relations Manager for commercial accounts at Caguas Bairoa Branch, who while conducting field visits to numerous clients, never personally experienced a customer confusion incident. The only incidents he alluded to, were being asked three to five times a week, during 2014, if Oriental Bank was to relocate. This on account of clients having seen a construction permit from Cooperativa at a Caguas street, presumably, the location where the Western Union was to be built. The only other incident he alluded to, was of a customer, asking for information on how to create a "direct deposit account." While the service could have been provided at Oriental Bank, the customer opted not to because he had been instructed to open his account at Cooperativa. Also, Delgado, who works at Las Catalinas Branch in Caguas and has worked for Oriental Bank for eight years, clarified that Oriental Bank and Cooperativa are not competitors as to the commercial portfolio, rather at the retail services level which is the level at which she has heard, at Branch meetings, that tellers do allude to incidents where the customer questions or believes there may exist a relationship between the two entities: plaintiff and defendant.

having been confused, her new acquaintance may have simply been making small talk or seeking clarification as to her correct place of employment.  Or perhaps, unbeknownst to her, another one of Oriental Bank's Caguas branches was nearby.[15]  As explained below, the Court did not find Delgado's testimony about customer confusions credible.

Plaintiffs' final witness, Betzaida Bonilla-Rivera ("Bonilla-Rivera"), has been a teller and teller supervisor with Oriental Bank since 2012, and she currently works at the Bairoa Branch in Caguas.  **ECF No. 188** at 20–21.  Bonilla-Rivera testified that in 2012, while working for the bank in Humacao, she never met a client who mistook the bank for defendant's credit union.  *Id*. at 23.  Bonilla had also worked at the Oriental Bank Branches in Guayama and Aibonito. At the Bairoa Branch in Caguas, however, she claims that around eight to fourteen customers each week confuse the bank with the credit union: five to ten of them try to cash a Cooperativa check at the bank, while the other three to four try to deposit money into a Cooperativa account.  *Id*. at 23.  Bonilla-Rivera testified further, that a customer once came to the bank to buy a concert ticket. When told that the bank didn't sell the tickets, the client made a phone call and determined that the tickets were being sold by the Cooperativa. The customer then asked if both entities were the same.  *Id*. at 24.  In fact, Bonilla-Rivera claims that the U.S. Postal Service once mistakenly delivered the Cooperativa's mail to her branch.  *Id*. at 25–26.  According to her,

---

[15] Although no other witness came close to testifying to the sheer magnitude of alleged confusions that Brenda Delgado-Colón did, plaintiffs, perhaps tellingly, spent only two transcript pages of direct examination on her encounters with such alleged confusions.  *See* **ECF No. 187** at 94–95.  As indicated in the main text above, the Court finds no reason to believe that Delgado's only specific account of alleged confusion actually involved a person confusing plaintiffs' bank with defendant's credit union.

confused consumers believe that the bank and the credit union are the same "[b]ecause of the Oriental name," and when Cooperativa clients arrive at the bank, they have to be steered to the Cooperativa "across the street." *Id*. at 24–25. The Cooperativa branch across the street appears to be a recent addition, having been open for only about one and one-half to two years. *Id*. at 26. Her branch of Oriental Bank is an exceptionally busy one, processing more than 5,000 transactions per week. *Id*. at 30. Taking Bonilla-Rivera's testimony as correct it will account for a weekly confusion rate ranging between (.16) to (.28) percent; less than one per cent.

Defendant's witnesses, in turn, responded to various aspects of plaintiffs' case, testifying, as well, to Cooperativa de Ahorro y Crédito Oriental's marketing and internal processes. Mayra Medina-Rivera ("Medina-Rivera") a Credit Manager with the Cooperativa at its headquarters in Humacao, stated that a prospective loan applicant once brought her a pre-approved loan offer from Oriental Bank to compare the bank's rate with the credit union's rate. *Id*. at 91–92. Such "shopping around" for the best deal "is very normal with customers," she said, and does not mean that the customer had confused the credit union with the bank. *Id*. at 92, 98. Medina-Rivera also testified about a former client who had contacted her upon finding out that she was working for defendant. Reportedly, he opened an account with defendant and upon verifying that defendant is a credit union, closed his accounts at commercial banks. *Id*. at 92-93, 97.

Griselle González-Morales ("González"), a Branch Manager at the Cooperativa's 65th Infantería Branch in Río Piedras, testified that their clients may pay off their loans at certain other credit unions through their Share Branch service, and that the credit union has no control

over where its clients purchase their personal checks and what information is printed on those checks.  *Id*. at 113, 116–17.  According to González, over the past three years, only one or two customers have asked her whether the credit union is affiliated with Oriental Bank.  *Id*. at 127.

Giovanni González-Malecio ("González-Malecio"), a teller supervisor at the Cooperativa's location in Caguas, testified that, over the ten-plus years he has worked for the credit union, he has seen only two instances of a customer appearing to confuse the credit union with Oriental Bank.  *Id*. at 68, 70–71.  In both cases, the customer tried to cash an Oriental Bank check at the credit union's drive-in ATM.  In one case, the customer realized that he had meant to go to the Oriental Bank nearby.  *Id*. at 71.  In the other case, the customer had no idea where to go to cash the check, and he had to be directed to the nearby Oriental Bank.  *Id*.  Both incidents had occurred within the last seven months.  *Id*. at 72.  González also reviewed some photographs that plaintiffs had submitted of the credit union's use of certain marks and logos, *see* Pls.' Ex. 14, testifying persuasively that the photos were misleading because their coloring was off, thereby causing some parts of the marks and logos to look less legible or visible than they actually are.  **ECF No. 189** at 72–73.

Amaryllis Ayala ("Ayala"), the Cooperativa's Vice President of Operations, also reviewed some of the photos that plaintiffs had submitted of certain marks and logos used by the credit union, (*see* Pls.' Ex. 14), and persuasively explained, as well, that the photos were

misleading for the same reasons as González-Malecio had noted.[16]  **ECF No. 189** at 90–92.  Ayala

testified that, since she first started to work for the Cooperativa as a teller in 2001, she has had

only one client ask, whether the credit union is affiliated with Oriental Bank (and the client

wanted reassurance that the credit union is not).  *Id*. at 77, 85–86.  Intriguingly, Ayala recalled

that, at the Cooperativa's Centro Comercial Branch in Humacao, Banco Popular clients would

routinely show up at the credit union, on the third of each month, to cash their Social Security

checks into their Banco Popular accounts.  *Id*. at 86.  It, thus, appears that a certain level of

consumer carelessness or lack of specific knowledge may be endemic within the local financial-

institution market.  Defendant, however, did not question plaintiffs' witnesses to see whether

the clients of other institutions regularly show up by mistake at Oriental Bank.

Ángel Rodríguez-Virella ("Rodríguez"), the Executive President of the Cooperativa for

the past thirteen and one-half years, testified that the credit union uses its full name 95% of the

time and shortens its name to Cooperativa Oriental or Coop Oriental only if there is "a limitation

of space."  **ECF No. 188** at 137–38, 142.  To illustrate the credit union's use of shortened names

when faced with a space constraint, Rodríguez pointed to its promotion on a staircase inside the

Centro de Bellas Artes de Humacao and its sponsorship of sports teams, as examples of where

the credit union has used the COOPERATIVA ORIENTAL mark instead of its full name to

---

[16] In light of this persuasive testimony, as well as the obvious issues of lighting and atmospherics that appear to impact, if not mar, the accuracy and clarity of the photographs included in Plaintiffs' Exhibit 14, at least as to "coloring;" the Court declines to find that such photos are dispositive as to what those marks and logos truly look like. However, those photos certainly assist in determining the impact that the signs may have on public perception, as it relates to the size of the letters and logo utilized.

optimize legibility.  *Id*. at 142–46; *see* also Def.'s Exs. Q, S.  According to Rodríguez, the credit union currently budgets approximately $650,000 per year for advertising, which amounts to an increase of approximately $250,000 to $300,000 per year since 2010.  *Id*. at 166.

Edgar Hernández-Hernández ("Hernández"), an advertising consultant to the Cooperativa since 2010, explained that although the credit union's marketing strategy revolves around the logo that the Court approved in 2010, which uses the company's full name, the Cooperativa also abbreviates its name "to facilitate . . . communication" and mirror the speech habits of the "average person" in Puerto Rico.  **ECF No. 190** at 2–3, 7, 11, 13.  Just as locals often say, "let's meet at Plaza, instead of saying Plaza las Americas," they also say, "I am going to the Cooperativa Oriental [instead of] I am going to the Cooperativa de Ahorro y Crédito Oriental." *Id*. at 13.  Hernández testified that using the Cooperativa's full name or its Court-approved logo is not always feasible because "squeezing the logo within an already defined space" can "completely distort the logo," and the repeated use of the credit union's full name in audio advertising (which by the advertisement industry's standards may range from 15 seconds to not more than 60 seconds); can take up inordinate amounts of time.  *Id*. at 20, 28–29.  Indeed, Hernández opined that "it would be disastrous" if the credit union could no longer use its COOPERATIVA ORIENTAL and COOP ORIENTAL marks.  *Id*. at 34.  For example, the Cooperativa's sports sponsorships, which routinely use those shortened or abbreviated marks, constitute up to 50% of its advertising budget.  *Id*. at 33.  Moreover, other credit unions in Puerto

Rico, like Cooperativa de Ahorro y Crédito Arecibo (better known as CooPACA), routinely abbreviate their names to market themselves. **ECF No. 191** at 51.

In rebuttal, Oriental Bank recalled Montalvo, its Vice President of Marketing and Public Relations, to show, among other things, that: it is physically possible for Cooperativa de Ahorro y Crédito Oriental to print its full name in small spaces; to say its full name in short audio clips; and to market itself by investing in non-word marks like a sound mark and the use of a well-known media personality as official announcer or spokesperson. *Id*. at 75, 78–81.

## II.      Court's Specific Findings of Applicable Facts

As indicated above, in the Court's summary of relevant evidence proffered at the hearing, plaintiffs have shown that instances of actual confusion of Oriental Bank with defendant's credit union do occur but, are rare.  Although many of plaintiffs' witnesses claimed (or, at least, intimated) that the incidence of confusion is higher, the Court finds that the credible evidence shows that, time and again, the witnesses based their claims upon hearsay, made cross reference to the same incidents,[17] speculation, or a bias that viewed every mention of defendant's credit union as a sign of customer confusion.  At other times, the Court simply did not believe the full extent of the testimony.  Often, plaintiffs' counsel did not elicit sufficient facts or details for the Court to find credible a witness's claim that an incident related to actual confusion of the

---

[17]   These are witnesses, like Brenda Delgado-Colón, Betzaida Bonilla-Ortiz; Figueroa-Rodríguez; Ortiz-Vázquez, and Gilberto Medina who all work for Oriental Bank in Caguas at either Plaza Centro, Las Catalinas or Bairoa Branch. Actually, Bonilla-Rivera and Medina, both work at the Bairoa Branch in Caguas, while Delgado, Figueroa-Rodríguez and Ortiz-Vázquez work at Las Catalinas Branch in Caguas.

customer.  Accordingly, the Court now finds, based on the record before it that, up through the end of 2016, there were, at best, only sporadic instances throughout Puerto Rico of people confusing Oriental Bank with Cooperativa de Ahorro y Crédito Oriental.

Ely Figueroa-Rodríguez, an Oriental Bank employee since 2012, credibly testified to only one instance of customer confusion up to 2016.  *See* **ECF No. 187** at 104–06.  Elizabeth Ortiz-Vázquez, an Oriental Bank employee since 2014, credibly testified to only two instances of such confusion.  *See id*. at 113–14.  Gilberto Medina-Cardona, an Oriental Bank employee since 2011, testified that he used to field questions based upon an apparent confusion of the bank with defendant's credit union, but he credibly testified that the questions stopped once the credit union opened in Caguas, area where he works, and that he has encountered only one other instance of potential customer confusion.  *Id*. at 121–24, 127.  Nancy Santiago-Velázquez, an Oriental Bank employee for twenty-three years, could credibly recall only two instances of customers confusing Oriental Bank with defendant's credit union while cashing a check.  *Id*. at 131–34.  She also credibly testified that the only other times she has encountered a customer trying to perform a Cooperativa transaction at her bank is when, once every three months, someone tries to pay off his Cooperativa loan at the bank's drive-in ATM.  *Id*. at 134.  The Court sees no reason to attribute this quarterly mistake to consumer confusion, as opposed to consumer carelessness.[18]

---

[18]  The evidence as presented does not indicate who were those attempting to do a loan payment at Oriental, their age or, if they were "first timers" or if they had incurred in repeated mistaken conduct.

Veronica Álvarez-Ortiz, an Oriental Bank employee since 2006, credibly testified to only a handful of potential customer confusions, namely the three to five people who, between 2012 and 2015, tried to voluntarily turn their vehicles in to her branch, assuming that the branch was affiliated with defendant's credit union.  This is, three to five cases in a four year span. *Id*. at 145–46, 151.  If those people were confused about the bank's affiliation with the credit union, plaintiff's position is that such confusion was prompted by defendant's use of the name "Oriental."  Norma Galarza-Rivera, an Oriental Bank employee since 2012, credibly testified to only two instances of potential client confusion.  *Id*. at 154–56.  Zeidy Escandón-Velázquez, an Oriental Bank employee since 2011, credibly testified to only one instance of such confusion.  *Id*. at 163, 166.  Yalessa Arce-Rivera, an Oriental Bank employee since 2012, also credibly testified to only one such instance.  *Id*. at 170–71.

Yesenia Bonilla-Ortíz, an Oriental Bank employee since 2007, credibly testified to, at most, three instances of customer confusion, all of which had occurred within the last one and a half months.  **ECF No. 188** at 5–8.  Melissa Zayas-Moreno, an Oriental Bank employee since 2012, credibly testified to sporadic occurrences of apparent customer confusion, namely the three to four customers per quarter who try to cash a Cooperativa check at Oriental Bank.  *Id*. at 14–15.  Her Branch, however, processes approximately 9,000 transactions per month.  *Id*. at 17. Bonilla's branch processes about the same amount of monthly transactions.  *Id*. at 11. Accordingly, given the size of that denominator, it seems that the incidence of such instances of confusions—assuming they are genuine confusions—are, all events considered, sporadic or

rare. This is also evident if we consider that fourteen (14) of plaintiffs' witnesses, who testified

having worked for Oriental from 2011 to 2016, at seventeen (17) different branches, were able to

testify only as to fifteen (15) separate incidents of client confusion. Only two witnesses were able

to testify about "an incident every 3 months" or "3 to 4 incidents per quarter."

The only witness who testified credibly, as to customer confusions that can be called more

than sporadic was Betzaida Bonilla-Rivera. Being an Oriental Bank employee since 2012,

Bonilla-Rivera claimed that eight to fourteen clients every week, at the Bairoa Branch in Caguas,

confuse the bank with Cooperativa de Ahorro y Crédito Oriental.  *Id*. at 23.  According to her

testimony, those customers believed both institutions were either the same or related "because

of the Oriental name."  But the most intriguing part of Bonilla's testimony was her statement

that, when she worked for Oriental Bank in Humacao in 2012, none of her customers confused

the bank with defendant's credit union.  *Id*.  No such confusion was either mentioned to exist

while she worked at the Aibonito or Guayama branches. That indicates that whatever is

happening at the Bairoa Branch  (where it appears that Oriental and Cooperativa are located

across the street) appears to be specific to that location in Caguas, because no other witness

credibly testified to anywhere near the frequency of confusion as she did.

Although Delgado also testified to high rates of consumer confusion, the Court does not

fully credit her testimony in that regard.  If up to twenty percent of her customers are actually

confused about whether Cooperativa de Ahorro y Crédito Oriental is affiliated with Oriental

Bank, *see* **ECF No. 187** at 94, 99, it is inexplicable why, at a personal level, she has not met a single

confused customer while at the bank itself. *See id*. at 96.  And, as the Court explained above, her only specific anecdote about customer confusion did not obviously show any confusion at all. *See id*. at 101–02.  Assuming a scenario of three incidents of confusion per week during the nine years she has worked for Oriental Bank, Delgado was asked if she could have faced over 1400 incidents of confusion.  Having observed Delgado waiver when asked whether she has actually met with such number of confused clients, the Court finds that her testimony was not completely credible.

It is clear to the Court that actual customer confusion of plaintiffs' bank with defendant's credit union, though sporadic, does exist.  However, it is also clear to the Court that some of the alleged examples of customer confusion proffered by plaintiffs are actually instances of mere carelessness or probably prompted by the proximity of the locations for Oriental and Cooperativa (like in Caguas) or something else entirely.  Most witnesses testified to two or three instances in periods exceeding five years at Branches where thousands of financial transactions occur on a weekly basis.  The Court also credits the testimony of Amaryllis Ayala, Cooperativa's Vice President of Operations, who indicated that, when she worked at the credit union's Centro Comercial Branch in Humacao, Banco Popular clients routinely showed up, on the third of each month, to cash Social Security checks into their Banco Popular accounts—not realizing, of course, that they were at an entirely different institution.  **ECF No. 189** at 86.  The Court also credits the testimony of Giovanni González-Malecio, a teller supervisor at the Cooperativa's Caguas branch. In his testimony he alluded to a person who once, tried to cash an Oriental Bank

check at his branch, not because the person was confused about the affiliation of the bank with

the credit union, but because he had been careless and pulled his car into the wrong drive-in

ATM.  **ECF No. 188** at 71.  More generally, the Court credits defendant's witnesses as to the low

incidence of consumer confusion that they have experienced as employees of the Cooperativa.

After all, their testimonies not only appeared credible, but were also, reasonably in line with the

run of testimonies provided by plaintiffs' employees.

Finally, the Court credits Ángel Rodríguez-Virella, defendant's Executive President.

Rodríguez testified that the Cooperativa has employed abbreviated marks, like COOPERATIVA

ORIENTAL and COOP ORIENTAL, only if there is "a limitation of space," whether physical or

temporal.  *Id*. at 137–38, 142.  His testimony was corroborated by that of Edgar Hernández-

Hernández, the advertising consultant, who indicated that the Cooperativa has used those

abbreviated marks "to facilitate . . . communication" and that such action mirrors the speech

habits of the "average person" in Puerto Rico.  **ECF No. 190** at 2–3, 7, 11, 13.  The Court further

credits his testimony when he stated that using the Cooperativa's full name is not always

feasible, especially when discussing the time constraints in audio advertising.  *Id*. at 28–29.

The Court shall make further findings of fact, as necessary, below.  The Court also stands

by its analysis of the facts as set forth in its summary of the hearing evidence, above.

### III.    Legal Discussion

### A.    Standard of Review

As summarized above, the First Circuit Court of Appeals found that defendant's marks COOP ORIENTAL, COOPERATIVA ORIENTAL, and ORIENTAL POP "infringe upon Oriental Group's trademark rights[,]" and vacated the portion of this Court's judgment to the contrary. *Oriental Fin. Grp., Inc.*, 832 F.3d at 36.  Furthermore, it remanded the instant case "for reconsideration of whether to expand the scope of the injunction to address the use of those marks." *Id*.  Specifically, the First Circuit directed this Court to "reassess equitable factors" pertinent to the adjudication of a request for injunctive relief pursuant to *eBay Inc.*, 547 U.S. at 391, and *Voice of the Arab World, Inc., v. MDTV Med. News Now, Inc.*, 645 F.3d 26 (1st Cir. 2011) (First Circuit's application of the *eBay* factors in the trademark context). **ECF Nos. 150** at 44-43. It is well established that "an appellate mandate constrains the scope of proceedings on remand." *Díaz* v. *Jiten Hotel Mgmt., Inc.*, 741 F.3d 170, 175 (1st Cir. 2013). As such, while a mandate from the corresponding First Circuit Court of Appeals "requires [this] [C]ourt to 'scrupulously and fully' carry out [the] higher court's order after remand," the Court is foreclosed "from reconsidering matters determined in the appellate court." *Id*. (quoting *Biggins* v. *Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997)).

The Lanham Act "provides a court the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent[,]' among other things, trademark infringement." *Voice of the Arab World, Inc.*, 645 F.3d at 34

(brackets in original) (quoting 15 U.S.C. § 1116(a)).  The aforementioned statutory provision "codifies the traditional equitable remedy of injunction." *Id*. (citing 3-14 Anne Gilson LaLonde, Gilson on Trademarks § 14.02[1] (2011)).  As held by the United States Supreme Court in *eBay Inc.*, 547 U.S. at 391,

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion.

(Internal citations omitted.) "An injunction should not be granted where 'a less drastic remedy' will suffice." *Id*. at 157 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010)). Moreover, "[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs," so courts must "closely tailor injunctions to the harm that they address." *Tamko Roofing Prods. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002) (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979); then quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990)).

**B.      Equitable Factors as to Injunctive Relief Sought Regarding Defendant's Use of the Infringing Marks**

**1.   Irreparable Harm**

As previously held in light of *eBay*, 547 U.S. at 393-94, the Court does not presume irreparable harm upon a finding of trademark infringement in this case, requiring instead proof of the alleged harm. *See* **ECF No. 156** at 6. In arguing for expanded injunctive relief, plaintiffs assert to have suffered irreparable injury related to their proof of actual client confusion caused by defendant's continued use of the infringing marks.  **ECF No. 157** at 11-15.  Specifically, plaintiffs allege that said client confusion has caused "(1) harm to its reputation; (2) weakening of its goodwill; [and] (3) deprivation of control of its brand." *Id.* at 11.  Defendant counters that plaintiffs have failed to support its contention with evidence of irreparable harm arising from defendant's use of the infringing marks in particular. **ECF No. 160** at 9-11. According to defendant, "[a]bsence of such evidence—in light of Coop Oriental's aggressive marketing during the last six years—clearly signals that the problem that gave rise to this case was not the [infringing] word mark, but rather the dress that Coop Oriental adopted in 2009," which was subject to the 2010 Injunction Order and is not at issue on remand before the Court. *Id.* at 11; *see* **ECF No. 150** at 5-10.  However, as held by the First Circuit Court in this case, requiring a showing of actual confusion is "contrary to the established principle that evidence of actual confusion is not necessary to establish a likelihood of confusion," the latter being the required

showing under the Lanham Act to prove trademark infringement. *Oriental Financial Group, Inc.*

*v. Cooperativa de Ahorro y Crédito Oriental*, 698 F.3d 9, 17 (1st Cir. 2012).

In support of its argument of irreparable harm, plaintiffs proffer the following evidence

on the record:

> (i) for decades Oriental has spent substantial time and resources developing the
> goodwill in the ORIENTAL family of marks (Tr. 9/15/10, p. 51, lines 15-16); (ii)
> Oriental uses the term ORIENTAL in connection with all of its companies,
> divisions, products and services as a marketing strategy so that the public can
> easily identify that a particular company or division is part of the Oriental family,
> and that the product or service is provided by Oriental and its family of businesses
> (Tr. 9/15/10, p. 19, lines 17-21; p. 99-100, lines 9-19); (iii) the word ORIENTAL has
> always been the most prominent and important element of Oriental's family of
> marks (Tr. 9/15/10, p. 21-22, lines 14-5; p. 23, lines 14-16; p. 98, lines 11-12; *see also*
> Plaintiffs' Exh. 7); (iv) Oriental invests heavily in building and maintaining control
> over its brand, using mass media to promote its products and services, advertising
> all year round (Tr. 9/16/10, p. 77, lines 1-4); (v) Oriental has been careful to ensure
> brand consistency and control, creating a brand book that sets forth the guidelines,
> authorized uses, and non-authorized uses of its mark (Tr. 9/15/10, p. 29, lines 4-16;
> *see also* Plaintiffs' Exh. 10); (vi) Oriental's brand building efforts have been effective
> to the point that both the public and the press simply use the term ORIENTAL
> when referring to Oriental's companies (Tr. 9/15/10, p. 24-25, lines 1-25; *see also*
> Plaintiffs' Exh. 8); (vii) Oriental is one of Puerto Rico's most recognizable brands
> (Tr. 9/16/10, p. 85, lines 13-21); and (viii) Maintaining and protecting its strong
> mark is vital to Oriental's success.

**ECF No. 166** at 3 (emphasis omitted).  Moreover, as evidenced by some of the witnesses'

testimonies at the hearings on remand, as summarized above; the Court finds that there have

been sporadic instances of people confusing plaintiffs' bank with defendant's credit union as a

result of its 2009 rebranding and subsequent advertising campaign. Thus, contrary to

defendant's contention, plaintiffs have proffered evidence that the integrity of plaintiffs'

carefully cultivated brand and reputation has been compromised to some degree since 2009 by

defendant's brand promotion, which includes the use of the infringing marks.  In that respect,

the evidence of sporadic confusion that arose in the recent hearings are in line with the First

Circuit's findings that defendant's use of the infringing marks "have caused confusion in the

past" and "client confusion is also likely in the future." *Oriental Fin. Grp., Inc.*, 832 F.3d at 32.

In short, the Court finds the aforementioned evidence to be supportive of plaintiffs' claim

of irreparable harm due to damage to their reputation, loss of goodwill and of control of their

brand resulting from the continued use of the infringing marks unless expanded injunctive relief

is granted.  Accordingly, the Court finds that the first equitable factor weighs in favor of

plaintiffs.

## 2.      Inadequacy of Available Legal Remedies

The injuries alleged by plaintiffs in support of their request for expanded injunction--

harm to reputation, loss of goodwill, and deprivation of brand control—are injuries that cannot

be repaired or compensated with monetary damages. *See Ross-Simons of Warwick, Inc.* v. *Baccarat,*

*Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Because injuries to goodwill and reputation are not easily

quantifiable, courts often find this type of harm irreparable.").  As Oriental Bank's Vice President

Montalvo convincingly stated, those injuries to the bank's brand and reputation are

"incalculable." **ECF No. 186** at 54.  Defendant, meanwhile, does not claim that any injuries it has

caused to the integrity of plaintiffs' brand and reputation are remediable through damages.

Rather, defendant argues that any harm suffered by plaintiffs can be remedied by a narrower

injunction than plaintiffs have requested. *See*, e.g., **ECF No. 160** at 16–19 (see also related discussion below). Thus, the second equitable factor weighs in favor of plaintiffs.

> **3**.     **Balance of Hardships Between the Plaintiff and Defendant**

Plaintiffs aver that the balance of hardships weighs in its favor, contending that "[defendant] has no right to utilize infringing variations of the ORIENTAL mark in advertising and selling its services in the first place. An injunction would merely prevent Cooperativa from doing what the law already prohibits it from doing." **ECF No. 157** at 17. (citing *Northeastern Lumber Mfrs. Ass'n v. Northern States Pallet Company, Inc.*, 2011 WL 320619 at *4 (D. N.H. Jan. 31, 2011); *Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 2007 WL 4262725 at *3 (M.D.N.C. Nov. 30, 2007)).  According to plaintiffs, "not issuing an injunction impose significant hardships on Oriental" due to the likelihood of irreparable harm that would ensue from a continued use of the infringing marks, as discussed above.  **ECF No. 157** at 17.

Defendant argues that the balance of hardships weighs in its favor because "[w]hile OFG[] has spent the past [six] years investing in building its ORIENTAL word mark, Coop Oriental has spent four times as long strengthening the challenged marks," and that it too has invested considerably in its marketing budget.  **ECF No. 160** at 13.  Further, defendant avers that the infringing marks are "merely an abbreviation of its corporate name," *id*. at 13, which it deems to be a common practice among credit unions and in commerce at large. *Id*. at 13-15. Additionally, defendant contends that precluding the use of the infringing marks "will seriously interfere in Coop Oriental's ability to advertise in print media by lengthening [its mark] by 19

characters," and will undermine its "distinctiveness with regard to the other 117 active" credit unions in Puerto Rico. *Id*. at 16.

The Court finds defendant's arguments as to balance of hardships unavailing. Defendant's contentions about its decades-long use of the infringing marks are contrary to the First Circuit's findings in this case.[19]  Moreover, insofar as the First Circuit found the marks in question to be infringing, defendant does not have "any standing to complain that [its] vested interests [in its infringing use of marks] will be disturbed" by an expanded injunction. *Concrete Mach. Co.* v. *Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (quoting *Helene Curtis Indus., Inc.* v. *Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977)). A copyright infringer "should not be allowed to continue to profit from its continuing illegality at the copyright owner's expense[,]" "even if the defendant will incur the relatively greater burden[.]" *Concrete Mach. Co., Inc.*, 843 F.2d at 613.

An injunction against defendant precluding the use of the infringing marks will entail considerable costs. Nevertheless, defendant took on that risk when it selected the infringing marks.  The Court also finds that the hardship that will befall defendant if expanded injunctive relief is granted, pales in comparison to the continued irreparable harm that will befall plaintiffs

---

[19] For instance, the First Circuit found that "although the COOP ORIENTAL mark may have appeared in Cooperativa's logo since 1996, Cooperativa did not furnish any evidence from between 1999 and 2009 demonstrating how or in what degree this logo was disseminated in Puerto Rico. Indeed, there are no advertisements of any sort from Cooperativa in the record dated between 1999 and 2009." *Oriental Fin. Group, Inc.*, 698 F.3d at 24.

if an expanded injunction does not issue.  Accordingly, the Court finds that the third equitable factor weighs in favor of plaintiffs.

### 4.        Public Interest

The Court finds that the public interest supports expanded injunctive relief, not only because consumer confusion is obviously contrary to the public interest, but because, "as a matter of public policy, trademarks should be protected against infringing uses." *Borinquen Biscuit Corp.* v. *M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006) (citing *Volkswagenwerk Aktiengesellschaft* v. *Wheeler*, 814 F.3d 812, 820 (1st Cir. 1987)).  Although defendant has suggested that its sponsorship of sports teams might suffer if it can no longer visually market itself by using the infringing marks, *see* **ECF No. 188** at 153-154, the Court does not doubt that both defendant and the sports teams will survive through alternate means of advertising and sponsorship.[20]

In conclusion, the four equitable factors under applicable law weigh in favor of an expanded injunction regarding the defendant's use of the three infringing marks.  Even though the instances of confusion between plaintiff's bank and defendants' credit union are sporadic, some confusion exists, as does defendant's continued use of the infringing marks which, the

---

[20] For example, defendant may want to try designing a new logo that markets the credit union under an abbreviation or variation of its corporate name that does not confusingly highlight the word ORIENTAL.  In that respect, perhaps the Cooperativa de Ahorro y Crédito Arecibo's use of the acronym CooPACA points one way forward. *See* **ECF No. 191** at 51. Perhaps the Court of Appeals' affirmation of defendant's right to continue using the mark CLUB DE ORIENTALITO, which the Court found to be "sufficiently distinct from ORIENTAL and its family of marks," points another way forward. *Oriental Fin. Grp., Inc.* v. *Cooperativa de Ahorro y Crédito Oriental*, 832 F.3d 15, 36 (1st Cir. 2016). To be clear, the Court does not predict whether either path will lead to an effective, non-infringing mark, but they may still be paths worth exploring.

Court surmises, is causing some people to bring their business to defendants while thinking, however, that they are transacting with plaintiff.  Accordingly, the Court finds that there are no alternative remedies as to the marks in question that would allow defendant to continue their use without continued trademark infringement.  Precluding the use of the infringing marks is necessary to prevent further harm to plaintiffs and to the consuming public, and is "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Tamko Roofing Prods.*, 282 F.3d at 40.  Thus, in light of the factual and legal findings discussed above, the Court grants plaintiffs' request to expand the injunction to include, a prohibition as to the use by defendant of the infringing marks COOP ORIENTAL, COOPERATIVA ORIENTAL, and ORIENTAL POP, as detailed below. **ECF No. 157.**

### IV.    Scope of the Expanded Injunction

The scope of plaintiffs' prayer for injunctive relief turned into a moving target towards the end of the hearing and briefing of the issues.  As recounted above, for the vast majority of this litigation, plaintiffs conceded and later stipulated, that defendant's use of its full corporate name, including in the logos this Court approved in 2010, *see* **ECF No. 61**, is non-infringing. *See*, *e.g.*, *Oriental Fin. Grp., Inc.*, 698 F.3d at 19–20 (directing that "[o]n remand the district court should also consider whether the COOPERATIVA ORIENTAL mark (and other potentially infringing uses of the ORIENTAL mark) poses a likelihood of confusion[,]" but "[t]his consideration does not include evaluation of Cooperativa's full corporate name, which Oriental concedes is non-infringing.").  Late last year, when this case was remanded to this Court for

the second time, plaintiffs stood by their longstanding concession. *See* **ECF No. 157** at 18 (declaring that "the injunctive relief sought by [plaintiffs] . . . will merely require [defendant] to use a name—i.e. its full corporate name—that does not cause confusion with [plaintiffs'] marks."). Plaintiffs continued to stand by their concession when, on November 16, 2016, the third day of hearings, they wrapped up their main presentation of evidence with the statement: "We are requesting that the Cooperativa going forward be required to use its full name . . . ." **ECF No. 188** at 49–50.

It was only on December 16, 2016, three days before the sixth and final day of the hearing (after defendant had already presented the bulk of its own case) that plaintiffs moved the Court "to bar [defendant] from using the Court-sanctioned logos with its full name, any other logo with its full name, and from using the ORIENTAL mark altogether; and that [defendant] be ordered to adopt a new name . . . that does not contain the word ORIENTAL." **ECF No. 182** at 21. According to plaintiffs, they hit upon the need to enjoin defendant from using its full name "[w]hile preparing for the evidentiary hearing." *Id*. at 2. The timeline above clearly belies that assertion, however, because plaintiffs continued to stand by their years-long concession as late as November 16, 2016, *after* they had finished presenting their evidence at the hearing. Instead, the actual impetus for their eleventh-hour about-face appears to have been this Court's Order to Show Cause, dated November 29, 2016, which strongly advised them of all the reasons why it was too late for them to suddenly challenge defendant's name as such. *See* **ECF No. 174**.

In their response to the Court's Order to Show Cause and their mid-hearing Rule 60(b)(5) motion, plaintiffs state that defendant ought to be enjoined from using its full corporate name, because they allegedly learned (either at, or during, or after their presentation of evidence at the hearing) that "the Court-sanctioned logo has not been sufficient to dispel the likelihood of confusion among consumers" and that, "[a]s testified by one of Oriental [Bank's tellers]: people see the word ORIENTAL and assume the entities 'are the same.'" **ECF No. 182** at 2; *see* also **ECF No. 181** at 16.  Plaintiffs' reasoning is weak.  The fact that sporadic actual confusion exists despite defendant's use of concededly (at least until very recently) non-infringing marks does not mean, or even suggest, that those marks are, in fact, infringing.  That is especially true when, as here, defendant has been frequently using the infringing marks to advertise itself.  In fact, the record indicates that up to 50% of defendant's advertising budget is spent on the sponsorship of sports teams, *see* **ECF No. 190** at 33, where, the record further indicates, the infringing marks are regularly used, *see* **ECF No. 188** at 142–50.  Based on plaintiffs' logic, whenever a party uses a single infringing mark, every other mark the party uses must also be infringing when there is proof of actual confusion.  Moreover, the Court finds plaintiffs' reliance on the speculation of one of their witnesses is particularly ill-placed, especially in light of the testimony they adduced, to prolonged number of years and a significant number of branches where Oriental Bank has operated free of any confusion of its bank with defendant's credit union.

In sum, the Court finds that, for purposes of this second remand, plaintiffs may not take back their concession (which they even accepted before the Appeals Court) , that defendant may

advertise itself under its full corporate name without infringing their trade and service marks. The Court does not doubt that plaintiffs may move the Court to modify the injunction when "applying it prospectively is no longer equitable." *See* Fed R. Civ. P. 60(b)(5).  The Court also believes that plaintiffs may even seek to enjoin defendant from using its full corporate name if and when the facts show that such extraordinary relief is warranted (assuming, nonetheless, that plaintiffs can overcome the many obstacles addressed by the Court in its Order to Show Cause).  However, nothing in the record of the evidentiary hearing, nor in a non-conclusory allegation by plaintiffs, shows that such facts or circumstances exist today.  And, plaintiffs have staked their claim to a Rule 60(b)(5) modification of injunctive relief on the evidence of actual confusion that allegedly came out at the evidentiary hearing.  The Court discerns no reason to convene a new evidentiary hearing when plaintiffs' evidence at the hearing does not provide any basis for their newfound conclusion that defendant's full corporate name—as opposed to the three marks that the Court of Appeals found infringing, *see Oriental Fin. Grp., Inc.*, 832 F.3d at 36—is the source of the sporadic confusion discussed herein.

### III.   Conclusion

Accordingly, the Court hereby **DENIES** plaintiffs' Rule 60(b)(5) motion at **ECF No. 182** requesting that the Court amend its earlier injunction to prohibit Cooperativa from using its full corporate name.  However, the Court **GRANTS** plaintiffs' motion for expanded injunctive relief at **ECF No. 157**.  In particular, the Court **MODIFIES** its earlier injunction, **ECF No. 54**, by expanding it to cover defendant's use of its COOPERATIVA ORIENTAL, COOP ORIENTAL,

and ORIENTAL POP marks.  Specifically, the Court **ENJOINS** defendant from using, in commerce, the marks COOPERATIVA ORIENTAL, COOP ORIENTAL, and ORIENTAL POP in connection with any of its goods and services.  Defendant may continue to use the Court-approved logos, *see* **ECF No. 61**, but it must respect the relative font sizes and proportions set forth in those logos, especially with regard to the size of the words "de Ahorro y Crédito" vis-à-vis the size of the words "Cooperativa" and "Oriental."  Finally, the Court also **ORDERS** defendant, pursuant to 15 U.S.C. § 1116, to file with the Court, within sixty (60) days, a report in writing under oath setting forth in detail the manner and form in which defendant has complied with this modified injunction.  Defendant must be in full compliance with this injunction by the end of the sixty-day period.  The Court shall strictly enforce its terms.

       **SO ORDERED**.

    At San Juan, Puerto Rico, on this 20th day of November, 2020.

                                         **S/AIDA M. DELGADO-COLÓN**
                                         **United States District Judge**